## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-21826-CIV-LENARD/O'SULLIVAN

**CARLOS A. ALONSO CANO, individually
and as guardian for his son, ANGIE ALONSO
MOREJON, and as next friend of his minor
daughters, KATY ALONSO MOREJON and
JANY LEIDY ALONSO MOREJON, and
FE MOREJON FERNANDEZ individually,**

      Plaintiffs,

**v.**

**245 C & C, LLC and CFH GROUP, LLC,**

      Defendants.

_____/

## ORDER GRANTING DEFENDANTS' DAUBERT MOTION SEEKING TO STRIKE THE DESIGNATION OF NANI SOLARES, M.S. AS AN EXPERT WITNESS AND PRECLUDE THE USE AND/OR PRESENTATION OF HER OPINIONS AND EXPERT WITNESS REPORT AT TRIAL OR FOR OTHER PURPOSES (D.E .393)

**THIS CAUSE** is before the Court on Defendants' Daubert Motion Seeking to Strike the Designation of Nani Solares, M.S., as an Expert Witness and Preclude the Use and/or Presentation of Her Opinions and Expert Witness Report at Trial or for Other Purposes, ("Motion," D.E. 393), filed November 30, 2020. Plaintiffs filed a pro se Response on January 11, 2021, ("Response," D.E. 414), to which Defendants filed a Reply on January 19, 2021, ("Reply," D.E. 425). Upon review of the Motion, Response, Reply, and the record, the Court finds as follows.

## I.  Background

Plaintiff Angie Alonso Morejon ("Angie") is a permanently disabled individual who suffers from, among other things, mental retardation, severe cerebral palsy, and spasticity. (Second Am. Compl. (D.E. 92) ¶ 4.)  Plaintiff Carlos A. Alonso Cano ("Carlos") is Angie's father and Plenary Guardian; Plaintiff Fe Morejon Fernandez is Angie's mother; and Plaintiffs Katy Alonso Morejon and Jany Leidy Alonso Morejon are Angie's sisters.  (Id. ¶¶ 14-17.)

During the relevant period, Plaintiffs resided in a rental apartment in the Villas of Hialeah apartment complex ("Villas") located in Hialeah, Florida.  (Id. ¶ 2.)  Defendant 245 C & C, LLC and/or Defendant CFH Group, LLC owns the Villas, (id. ¶ 22), while Defendant CFH Group, LLC operates the Villas, (id. ¶ 25).

On May 6, 2019, Plaintiffs initiated this federal lawsuit against Defendants.  (D.E. 1.)  On December 2, 2019, Plaintiffs filed the operative Second Amended Complaint asserting claims under the Fair Housing Act ("FHA") and Florida state law.  (D.E. 92.)

Plaintiffs retained Nani Solares, MS, LMHC, a psychotherapist and licensed mental health counselor, as an expert witness "to assess the level of psychological, emotional and personal distress and impairment each member of the family is experiencing on account of ongoing problems with the Management Company of the apartment that the family has resided in since 2011."  (Affidavit of Psychological Assessment ("First Affidavit"), D.E. 393 at 4.)[1]

---

[1]        Ms. Solares's "Affidavit of Psychological Assessment" and "Second Affidavit of Psychological Assessment" ("Second Affidavit") are attached as exhibits to Defendants' Motion

Defendants move to strike Ms. Solares as an expert witness and preclude the use and/or presentation of her opinions and Report at trial or for other purposes pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  (D.E. 393.)

## II.    Legal Standard

Federal Rule of Evidence 702 provides the general rule regarding the admissibility of expert testimony.  It states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> **(b)** the testimony is based on sufficient facts or data;
> **(c)** the testimony is the product of reliable principles and methods; and
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 requires federal district courts to perform a "gatekeeping" function concerning the admissibility of scientific and technical evidence.  United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (citing Daubert, 509 U.S. at 589 n.7, 597); Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147 (1999)).  "This function 'inherently require[s] the trial court to conduct an exacting analysis' of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702."  Id. (quoting McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002)).

---

at Docket Entry 393-1, along with several other exhibits.  Accordingly, the Court will cite the page number electronically generated by the Court's CMECF system, and not the page number of the Affidavits.

When determining the admissibility of expert testimony under Rule 702, the Court engages in a three-part inquiry which considers whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in <u>Daubert</u>; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

<u>City of Tuscaloosa v. Harcros Chems., Inc.</u>, 158 F.3d 548, 562 (11th Cir. 1998) (citing <u>Daubert</u>, 509 U.S. at 589).  "The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion . . . ."  <u>Frazier</u>, 387 F.3d at 1260.

District courts have broad discretion in deciding to admit or exclude expert testimony.  <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 142 (1997).  However, "[a] district court's gatekeeper role 'is not intended to supplant the adversary system or the role of the jury.'"  <u>Id.</u> (citing <u>Maiz v. Virani</u>, 253 F.3d 641, 666 (11th Cir. 2001) (quoting <u>Allison v. McGhan</u>, 184 F.3d 1300, 1311 (11th Cir. 1999))).  "Quite the contrary, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'"  <u>Id.</u> (quoting <u>Daubert</u>, 509 U.S. at 596).

Neither Party has requested a hearing on the <u>Daubert</u> Motion, and the Court finds that this is not a complicated case necessitating such a hearing.  <u>See</u> <u>Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.</u>, 402 F.3d 1092, 1113-14 (11th Cir. 2005) (explaining that trial courts are not obligated to hold hearing on <u>Daubert</u> motions and holding that "[b]ecause this is not a 'complicated case[ ] involving multiple expert

witnesses'—Dr. Maris was the only proffered expert—we cannot conclude that the district court abused its discretion by not holding a Daubert hearing.") (quoting United States v. Hansen, 262 F.3d 1217, 1234 (11th Cir. 2001) (quoting City of Tuscaloosa, 158 F.3d at 564 n.21)).

## III.   Discussion

Defendants argue that Ms. Solares is unqualified to serve as an expert witness in a Fair Housing Act case, (Mot. at 7-11), and that her opinions are unreliable and unhelpful, (id. at 11-21).

### a.   Qualifications

First, Defendants challenge Ms. Solares's qualifications to serve as an expert witness in a Fair Housing Act case.  (Mot. at 7.)  They note that Ms. Solares has only testified in two prior cases—one involving domestic violence, and the other a child custody proceeding—and she was unsure whether she served as a fact witness or expert witness in those cases.  (Id.)  She has never appeared as an expert in a federal court proceeding.  (Id.) Defendants further argue that Ms. Solares' experience has been limited to providing institutional group and individualized psychotherapy—between 2008 and 2013, she worked with inmates at a correctional institution, then in 2013 she opened a private practice which focuses on providing cognitive behavioral therapy.  (Id.)  Defendants argue that "[t]he only specialized training Ms. Solares has undertaken is in areas that are of no relevance to the issues before the Court in this case namely, discrimination and retaliation." (Id.)  They further argue that Ms. Solares "did not perform any studies or defend a thesis in order to obtain her Master's degree[,]" and "has never acted as an investigator in any

5

research project or study in the area of psychology because she chose not to obtain a Psy.D." (Id. at 8.)  They further note that "Ms. Solares has not published any articles in professional or scholarly journals or reviews[,]" "has never been a member of any professional associations[,]" and "has not been invited to present at any professional conferences or proceedings." (Id.)  She has published one book titled "Life's a Classroom: Ten Powerful Lessons for Living Your Best Life," which, according to Defendants, can best be characterized "as a work in the field of life coaching rather than psychology." (Id.) Defendants further note that Ms. Solares never has taken coursework in the subspecialty of forensic psychology[,]" and appear to argue that because Ms. Solares has no experience in forensic psychology she is unqualified to opine as to Plaintiffs' psychological distress in this case.  (Id. at 8-9.)  Defendants further note that Ms. Solares "admittedly has little knowledge about the Fair Housing Act ('FHA') and its requirements[,]" (id. at 9), and has never "encountered the issue of reasonable accommodation in her coursework or practice[,]" (id.).  They argue that even if Ms. Solares satisfies Rule 702's "knowledge, skill, experience, training, or education" in the area of cognitive behavioral therapy, "her expertise does not transfer over to the area of housing discrimination considering her lack of knowledge of the legal principles underlying the FHA and its burdens of proof." (Id. (citing Wilson v. Woods, 163 F.3d 935, 937 (5th Cir. 1999); Elcock v. Kmart Corp., 233 F.3d 734, 743-44 (3d Cir. 2000); Amos v. Rent-A-Center, Inc., No. 00–6289–CIV, 2001 WL 36095915 (S.D. Fla. Dec. 13, 2001)).)

Plaintiffs argue that in their "opinion," Defendants' argument that Ms. Solares is unqualified to serve as an expert witness in this case is "invalid, because Mrs. Solares, has

6

only given her master in psychology opinion that there has been emotional harm to the plaintiffs' family from the actions committed by the defendants, but whether or not those actions committed by the defendants were in violation of the Fair Housing Act will be the responsibility of the federal court."  (Resp. ¶ 9.)

In their Reply, Defendants argue that "Plaintiffs' position that the only qualifications an expert witness needs are an advanced degree and a shingle outside the door reduces the court's role as 'gatekeeper' under Fed. R. Evid. Rule 702 to a ministerial act and turns Daubert motions into a wasteful exercise of time."  (Reply at 3.)

The Court finds that Plaintiffs have not established that Ms. Solares is qualified to give expert testimony as to whether and to what extent Defendants' actions caused Plaintiffs psychological, emotional, and personal distress.  See Elat v. Nogubene, 993 F. Supp. 2d 497, 516-17 (D. Md. 2014).  In Elat, a young woman filed a lawsuit alleging that she was a victim of human trafficking forced into involuntary domestic labor.  993 F. Supp. 2d at 508.  The defendants filed a motion in limine to preclude certain testimony of the plaintiff's expert witness, Florence Burke, who had a master's degree in clinical psychology and extensive experience with victims of human trafficking.  Id. at 509. Relevant here, the defendants sought to exclude Ms. Burke's opinion as to the plaintiff's mental and emotional damages.  Id. at 515.  The plaintiff argued that "Ms. Burke has 'specialized knowledge' stemming from '[h]er education and experience in clinical psychology,' because she 'is a trained psychologist with multiple degrees, thirty years of experience with trauma victims in general, including in clinical settings, and fifteen years dealing with human trafficking victims in particular.'"  Id.  The plaintiff further argued that

7

"Ms. Burke is qualified to testify as an expert because she 'has been certified as an expert in human trafficking and its psychological toll' and 'has testified as an expert at trial and authored expert reports for a half-dozen human trafficking cases.'"  Id.  The court discussed two cases in which courts admitted Ms. Burke's testimony as expert testimony—one of which was a human trafficking case—and disagreed with those courts, finding that Ms. Burke was not qualified to give an expert opinion on emotional damages.  Id.  As to Ms. Burke's qualifications, the Court observed:

> Although Ms. Burke has a master's degree in psychology and has completed some coursework toward a Ph.D., she is not a licensed psychologist or licensed therapist.  Burke Dep. 11:22–12:11, 18:18–19:12, Pl.'s Opp'n to Mot. in Limine Ex. A, ECF No. 156–1.  Indeed, she is not a psychologist.  See What is psychology, www.apa.org ("Psychologists have doctoral degrees."); Definition of "Psychology," www.apa.org ("Psychology is a doctoral-level profession."); Careers in Psychology: The job outlook, www.apa.org ("By APA policy and licensing laws, the term psychologist is reserved for individuals with doctoral education and training.");[2] see, e.g., Md.Code Ann., Health Occ. § 18–402(b) (Unless the Maryland Health Occupations Article so permits, "a person may not use as a title or describe the services the person provides by use of the words 'psychological', 'psychologist', or 'psychology'.").

> As Ms. Burke stated, she interviewed Plaintiff but did not examine her, Burke Dep. 117:3–118:12, such that she was not giving a "diagnosis" of "emotional distress," but rather "an opinion essentially as to [Plaintiff's] mental health," id. at 209:21–210:13.  According to Ms. Burke, "[a] diagnosis is something that is a formal process, and it's based on guidelines put out by the Diagnostical [sic] and Statistical Manual for psychologists," and a person conducting a diagnosis "look[s] at symptoms that are presented to them in a structured interview that is done specifically for this reason."  Id. at 210:117–211:4.  Ms. Burke said that, in contrast, she reached her conclusions "[a]s someone who has worked many years clinically," by "noticing the demeanor of someone when [she is] talking to them" and "noticing how they respond

---

[2]       I take judicial notice of the content of the website of the American Psychological Association pursuant to Fed.R.Evid. 201.

to certain questions" and "looking at their . . . affect as they are reporting certain situations." Id. at 211:9–15. This is a distinction without a difference.

Of course, Ms. Burke could not have conducted a psychological examination of Plaintiff without a license to practice psychology. See Careers in Psychology: Getting ready to work in psychology, www.apa.org ("You must be licensed as a psychologist for the independent practice of psychology anywhere in the United States or Canada. Before granting you permission to take the licensing exam, the state licensing board will review your educational background. A doctoral degree does not automatically make you eligible to sit for the licensing exam; requirements vary from state to state. States require, at a minimum, that the doctorate be in psychology or a field of study 'primarily psychological in nature' and that it be from a regionally accredited institution."); see, e.g., Md.Code Ann., Health Occ. § 18–401(a) (With exceptions not relevant here, "a person may not practice, attempt to practice, or offer to practice psychology in this State unless licensed by the Board."); see also, e.g., Health Occ. § 18–302 (To have a license to practice psychology in Maryland, "[t]he applicant shall have a doctoral degree in psychology . . . ."). Moreover, Plaintiff has not shown a basis for Ms. Burke's understanding of emotional distress specifically, as opposed to human trafficking in general, other than Ms. Burke's incomplete doctoral coursework. Consequently, Ms. Burke's opinion is based solely on her lay observations as an interviewer and not on specialized knowledge of emotional distress. Therefore, Ms. Burke's opinion testimony on Plaintiff's alleged emotional distress is inadmissible and will not be considered on summary judgment or at trial. See United States v. Allen, 716 F.3d 98, 105 (4th Cir. 2013) ("[I]n order for expert testimony to be admissible, . . . the testimony must involve scientific, technical, or other specialized knowledge . . . ."); Fed.R.Evid. 702(a); Fed.R.Civ.P. 56(c)(2).

Id. at 515-17 (footnote in original, other footnote omitted).

Whereas the plaintiff in Elat cited the fact that Ms. Burke, inter alia, (1) had a master's degree in psychology, (2) had extensive experience with human trafficking victims, and (3) had been admitted as an expert witness on emotional damages in two prior federal cases, here, Plaintiffs cite only Ms. Solares's master's degree in psychology as qualifying her to render an expert opinion on emotional distress. (Resp. ¶ 9.) That is

simply not enough to qualify her as an expert on psychological and emotional distress.  See Elat, 993 F. Supp. 2d at 515-17.

Although not cited by Plaintiffs, the Court observes that, according to her CV, Ms. Solares has a Master of Science in Psychology and a Bachelor of Science degree, both from Carlos Albizu University.  (D.E. 393-1 at 90.)  Since 2013, she has worked as a solo practitioner in private practice as an individual, couples, and family therapist who also does group therapy and community wellness seminars and classes.  (Id.)  She also has experience with trauma and crime victims, and as a behavioral health specialist for female inmates. (Id.)

According to her Second Affidavit, Ms. Solares "is a Psychotherapist and Licensed Mental Health Counselor, practicing in Miami for over 14 years."  (D.E. 393-1 at 2.)  She testified at her deposition that her practice "focuse[s] on the cognitive behavioral aspect" of psychotherapy, which looks "at how the person's cognitions are affecting their behavior."  (Id. at 38:10 – 39:8.)[3]  She explained that "with cognitive behavioral therapy we do what's called cognitive restructuring which is helping the individual change their neurological pathways and their schemas.  Because the premise is if you can change the thinking you can change the behavior.  And if you change the behavior you change your life."  (Id. at 3:9-159.)

---

[3]      Because several documents appear in the Exhibit attached to Defendants' Motion, (D.E. 393-1), the Court will cite the page number electronically generated by the Court's CMECF system, and not the page number of the deposition transcript.

Plaintiffs point to no part of the record indicating that Ms. Solares ever evaluated any person for psychological, emotional, or personal distress prior to Plaintiffs, that she was ever trained in evaluating a person for psychological, emotional, or personal distress, or that she otherwise has specialized knowledge of psychological, emotional, or personal distress.[4]  Although Ms. Solares has a master's degree in psychology, she does not explain how her education and experience qualifies her to give the opinions regarding the cause and extent of Plaintiffs' psychological, emotional, or personal distress, and it is not self-evident.  In fact, although her CV indicates that she has training in (1) Traumatic Incident Reduction Therapy for individuals diagnosed with Post Traumatic Stress Disorder, (2) suicide prevention and crisis management, (3) critical incident stress debriefing, (4) personality disorders, and (5) STEPPS program for Borderline Personality Disorder, it does not indicate that she has any training in forensic psychology.  Indeed, Ms. Solares is not a psychologist.  See Elat, 993 F. Supp. 2d 497, 516-17 (D. Md. 2014) (finding that former licensed therapist who was not a licensed psychologist or therapist was unqualified to give expert testimony regarding the plaintiff's emotional injuries).

Simply put, Plaintiffs point to nothing in the record showing that Ms. Solares has any education or training in evaluating the cause or extent of psychological and emotional distress.  Rather, her opinions are based solely on her lay observations as an interviewer and not on specialized knowledge of emotional distress.  As such, the Court finds that

---

[4]     Ms. Solares explained during her deposition that Carlos found her when he walked into her office looking for a doctor who used to work there.  (D.E. 393-1 at 39-40.)  When Ms. Solares told Carlos that the other doctor no longer worked there, Carlos asked if Ms. Solares could help him.  (Id. at 40.)

Plaintiffs have failed to establish that Ms. Solares is qualified to give expert testimony on Plaintiffs' psychological, emotional, and personal distress. Elat, 993 F. Supp. 2d at 516-17; see also Wilson v. Woods, 163 F.3d 935, 937-38 (5th Cir. 1999) (affirming district court's finding that putative expert was not qualified to give expert testimony on accident reconstruction where the putative expert (1) had a bachelor's and master's degree in mechanical engineering, but no Ph.D., (2) had taught college level courses but never held a professorial rank, (3) had never taught an accident reconstruction course or any other course that involved automobile accident reconstruction, (4) had no degree or certification in accident reconstruction, (5) had not completed the requirements for certification by the Association of Accident Reconstructionists, (6) had testified in various cases, but one court had refused to qualify him as an expert in vehicle accident reconstruction based on his lack of qualifications, (7) had never conducted any studies or experiments in the field of accident reconstruction, and (8) was unable to show that his training or experience as a mechanical engineer gave him expertise in the field of accident reconstruction that was distinguishable from training received by other mechanical engineers); cf. Elcock v. Kmart Corp., 233 F.3d 734, 743-44 (3d Cir. 2000) (finding, "[d]espite misgivings[,]" that the district court did not abuse its discretion in determining that the plaintiff's vocational rehabilitation expert had the minimum qualifications to serve as an expert witness where although the expert had no formal training in vocational rehabilitation, he had "accumulated some experience" in the field, had "kept abreast of the relevant literature in his field[,]" had "consulted the Dictionary of Occupational Titles, a standard tool of the vocational rehabilitationist[,]" possessed "a degree in a field tangentially related to the one

12

about which he testified," had "attended conferences regarding vocational rehabilitation[,]" and had performed certain types of "vocational rehabilitation assessments").

However, even if Ms. Solares was qualified to give an expert opinion on the cause and extent of Plaintiffs' emotional and psychological distress, the Court would exclude her opinion as unreliable.

### b.    Reliability

Next, Defendants argue that Ms. Solares's opinion is unreliable and unhelpful. (Mot. at 11-21.)  They argue that although Ms. Solares's First Affidavit indicates that she performed a "biopsychosocial assessment" on each family member, and biopsychosocial evaluations are governed by scientific methods and principles, "they do not test causation[,]" and causation is a "crucial element" of a claim for relief and damages under the FHA.  (Id. at 11 (emphasis in original).)  They argue that "[b]y relying only on the methodology of a biopsychosocial assessment, Ms. Solares effectively blinded herself from consideration of other pre-existing or concurrent sources of trauma, stress and depression which she held would be otherwise relevant."  (Id.)  Furthermore, Defendants argue that at her deposition Ms. Solares stated that she had actually only performed a biopsychosocial assessment for Angie, and it is unclear what methodology Ms. Solares used to evaluate the other family members' claims of emotional distress and whether and to what extent they can be attributed to housing discrimination.  (Id. at 12.)  As a result, they argue that "the Court cannot even apply Daubert to determine if 'the methodology by which the expert reaches his conclusion is sufficiently reliable' because it is unknown."  (Id.)  Defendants further argue that Ms. Solares's opinion is unreliable because she failed to independently

verify information provided by Plaintiffs from collateral sources which, Defendants argue, "seems to have occurred due to her lack of background, training and experience in performing a forensic assessment and her frame of reference as one who practices clinical psychology." (Id.) They argue that "[a] psychotherapist usually performs a clinical assessment of a patient who has sought therapy to evaluate the best course of treatment[,]" whereas "[a] forensic examiner, on the other hand, performs an assessment to assist a legal fact finder, which may or may not help the person being evaluated." (Id. at 12-13 (citing psychologyiresearchnet.com, "Differences between Therapeutic and Forensic Assessment").) Defendants argue that because Ms. Solares accepted everything Plaintiffs told her, she failed to learn, inter alia,: (1) about other lawsuits Carlos filed in 2017 and 2018 in which Carlos and Fe sought damages for emotional distress "for events that took place concurrently with those described in the" Second Amended Complaint, (id. at 13 (emphasis in original)); (2) that Carlos had been hospitalized for nine days after being severely beaten by two men, and about the resulting lawsuit he filed for injuries and emotional distress he incurred and would continue to incur, (id. at 14); and (3) about thirteen contacts Carlos had with police during the same period, (id.). Similarly, Defendants argue that Ms. Solares improperly permitted Carlos to determine what he wanted her to consider (and not consider) when making her assessment, (id. at 15-16); she did not require each Plaintiff to complete a standardized background inventory that might have exposed preexisting or concurrent sources of trauma, stress, or depression, nor did she ask about issues such as substance abuse, physical abuse, or bullying, (id. at 16). Defendants further argue that Ms. Solares's opinion is unreliable because in making her

14

assessment she considered all of the incidents described by Plaintiffs during the entirety of

their residence at the Villas (going back to 2011), rather than limiting her assessment to

issues that arose in the two years prior to the filing of the lawsuit (consistent with the

applicable statute of limitations).   (Id.)  She also considered issues that the Court has

dismissed from this case.  (Id.)  Defendants argue that

> The very fact that Ms. Solares' Report covers the <u>entirety</u> of Plaintiffs'
> residency at VOH from 2011 through 2/20/20 and views each and every
> incident that Defendants allegedly took or did not take during that time
> period in the aggregate demonstrates her unfamiliarity with the FHA's
> burdens of proof for liability and for damages.  She therefore, <u>did not offer</u>
> <u>and cannot</u> offer an opinion on whether any <u>particular</u> unlawful act or
> omission by Defendants directly caused Plaintiffs' claimed anxiety, stress
> and depression should summary judgment or judgment on the pleadings be
> granted on some remaining counts.

(Id. at 17 (emphasis in original).)  Defendants further argue that Ms. Solares's opinion is

unreliable because "the Report does not state on what facts, documents or other

independent sources she relied upon to reach her conclusions and opinions."  (Id.)  In this

regard, Defendants note, inter alia, that Ms. Solares appears to give medical opinions

without any support or explanation for their bases.  (Id. at 17-18.)  They further argue that

opinions and conclusions Ms. Solares reached after viewing "unidentified" photographs

and videos of Angie are inadmissible because she lacks personal knowledge of the

circumstances surrounding the photographs and videos.  (Id. at 18 (citing Knox v. Cessna

Aircraft Co., 314 F. App'x 230 (11th Cir. 2008)).)  They further argue that some of Ms.

Solares's opinions could not have been based on personal observation because she only

saw Angie for an hour and a half, (id. at 18-19), and subsequent events have invalidated or

called into question some of her opinions, (id. at 19).  Defendants argue that many of the

same issues were presented in <u>Amos v. Rent-A-Center</u> where Judge Jordan excluded the expert's opinions.  2001 WL 36095915, at *4.

In their Response, Plaintiffs argue that Ms. Solares did identify other sources of Plaintiffs anxiety, stress, and depression, and specifically noted in her First Affidavit that (1) caring for Angie causes Carlos and Fe stress, and (2) Angie's emotional stability is "affected and threatened due to all of the things he has had to endure."  (Resp. at 6.) Plaintiffs further argue that the Court "must infer that the videos" they showed to Ms. Solares and upon which she based her opinions "would meet the challenge of acceptability and reliability mentioned by the defendants."  (<u>Id.</u> at 7.)  They attempt to distinguish Judge Jordan's decision in <u>Amos</u> on the facts, and assert that Ms. Solares's opinion was based on sufficient facts and data, and specifically, the medical records, photographs, and videos Plaintiffs provided to her.  (<u>Id.</u> at 7-8.)  They cite <u>Mancuso v. Consolidated Edison Co. of New York, Inc.</u>, 967 F. Supp. 1437 (S.D.N.Y. 1997) in support of their argument.  (<u>Id.</u> at 11.)

In their Reply, Defendants argue that Plaintiffs failed to meet their burden of establishing the reliability of Ms. Solares's opinion under Rule 702.  (Reply at 5.)  They argue that Plaintiffs failed to rebut that Ms. Solares's Affidavits lack "any explanation of what principles Ms. Solares relied upon or applied, whether those principles or methods are considered reliable in her field, and what steps, if any, she took to verify the data she considered through third parties or other independent sources."  (<u>Id.</u>)  They further argue that "Plaintiffs do not contest that her report does not even identify to what documents or

videos she referred in reaching these conclusions."[5]  (Id.)  They argue that [b]ecause Ms.

Solares' report simply parrots back what she was told by Plaintiffs without any attempt to

---

[5]      Defendants assert that in their Fourth Request for Production they asked Plaintiffs to produce the exact videos they had shown to Ms. Solares, but Carlos "could not remember which videos he had shown [her]."  (Id. at 5 n.4.)  However, Defendants discuss two videos mentioned in Ms. Solares's Report and argue that the opinions formed therefrom are unreliable.  First:

> Ms. Solares' report confirms [Carlos] showed her a video of malfunctioning laundry equipment and told her that noise from the machinery could be heard in their apartment and kept his family awake at all hours. Ms. Solares' expert witness report confirms she viewed the video, heard the noise depicted in it, that [Carlos's] description of the noise as loud is accurate and consequently, noise such as this would cause all of the Plaintiffs to suffer emotional distress.

(Reply at 3-4.)  Defendants argue that "[a] scientific approach, on the other hand, would have, at a minimum, questioned why [Carlos] failed to take the video from inside Plaintiffs' apartment to demonstrate that noise from the laundry equipment could be heard within and why the video failed to depict other family members whom he claimed were affected by the noise.  (Id. at 4.)  Thus, they argue that neither Plaintiffs' "representations nor the video support Ms. Solares' conclusion and opinion."  (Id. at 4.)

Second, Defendants argue that "[t]he same lack of scientific inquiry is evident from Ms. Solares' discussion of an unidentified video depicting tree cutting equipment in the parking lot downstair[s] from Plaintiffs' apartment."  (Id.)

> The report confirms that she was told by [Carlos] that noise from the machinery kept ANGIE from taking his routine afternoon nap.  It also confirms that she viewed (unknown) video(s) of ANGIE in his bed awake and vocalizing as noise from the tree cutting equipment can be heard in the background.  From these "facts" Ms. Solares opines that a daily routine is important to ANGIE and he suffered emotional distress from being kept awake by the tree cutting equipment.

> Had she not blindly accepted [Carlos's] representations of what the video(s) depicted, not allowed Plaintiffs to control what they chose to disclose and not to disclose, used scientific methodology and asked more probing questions, Ms. Solares would have learned at a minimum that: 1) ANGIE has no sleep routine, 2) there are numerous other videos depicting ANGIE sleeping while the tree cutting equipment is in vicinity of Plaintiffs' apartment; 3) ANGIE vocalizes for many reasons and 4) his vocalizations are indistinguishable. . . . Now the validity of Ms. Solares' opinion that loud noise from any source causes ANGIE emotional distress is further undercut by Dr. Smeal's scientific testing which established that ANGIE may or may not be able to even hear loud noise.

test the validity or veracity of their claims, determine what other causes account for emotional distress in their lives, or even consider if their claims of emotional distress are due to malingering, Ms. Solares and her report are of no assistance to the Court." (Id. at 5-6.)  They argue that

> Plaintiffs can offer the same testimony under oath which Ms. Solares would simply repeat at trial and explain in their own words what effect each incident had on their well-being. The Court also can weigh the credibility of their claims for mental and emotional anguish and distress[6] and apply its own knowledge, common sense and experience to determine if the daily annoyances of apartment living are worthy of compensatory damages and if so, in what amount.

(Id. at 6 (footnote in original).)

"When evaluating the reliability of scientific expert opinion, the trial judge must assess 'whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue.'"  Frazier, 387 F.3d at 1261-62 (footnote omitted) (quoting Daubert, 509 U.S. at 592-93).  In Daubert, the U.S. Supreme Court set forth four factors that "may or may not be pertinent in assessing reliability" in a given case, "depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."  Kumho Tire, 526 U.S. at 150.  Those factors are "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique

---

(Id. at 5.)

[6]     Because ANGIE is not communicative, Ms. Solares was in no better position than the Court will be at trial to determine if he suffered emotional distress.

is generally accepted in the scientific community." <u>McCorvey</u>, 298 F.3d at 1256 (citing <u>Daubert</u>, 509 U.S. at 593-94). The Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." <u>Daubert</u>, 509 U.S. at 595. "[T]he proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable." <u>Allison</u>, 184 F.3d at 1312 (citing <u>In re Paoli R.R. Yard PCB Litig.</u>, 35 F.3d 717, 744 (3d Cir. 1994)).

The Court finds that Plaintiffs have not established by a preponderance of the evidence that Ms. Solares's opinions are reliable. In fact, the only evidence regarding the reliability of Ms. Solares's opinion was presented by Defendants. Specifically, Defendants attached to their Motion the Affidavit of Dr. Jerome H. Poliacoff, Ph.D. filed in <u>Medina v. Cedars Health Care</u>, Case No. 01-05188-Civ-Seitz, a case in which the plaintiff sued her former employer for sexual harassment and retaliation, and claimed that her former employer caused her, inter alia, "emotional distress." <u>Medina</u>, D.E. 1 at 11-12. The plaintiff designated psychiatrist Huberto Meryao, M.D., as her expert witness on emotional damages, and Dr. Merayo performed a psychiatric evaluation of the plaintiff. <u>Id.</u>, D.E. 46 at 1-2. The defendant moved in limine to exclude Dr. Merayo's opinion as unreliable because, inter alia, Dr. Merayo "reached his opinion that [the plaintiff] suffered from <u>an adjustment disorder with depressed</u> mood by accepting as true everything that the patient related to him in terms of her symptoms." <u>Id.</u>, D.E. 46 at 5 (emphasis in original). The defendant argued that "[o]ne of the things [the plaintiff] told Dr. Merayo was that she was involved in an ongoing lawsuit against [the defendant] for sexual harassment, yet Dr. Merayo made no attempt to rule out the possibility of <u>malingering</u>, that is, the fabrication

of evidence as a result of the ongoing litigation."  Id., D.E. 46 at 5 (emphasis in original).

It further argued that Dr. Merayo "made no attempt to rule out the possibility that [the

plaintiff] suffered from a Personality Disorder which, he acknowledges, can affect that

patient's interpretation of surrounding events.  Id., D.E. 46 at 6.  In support of its argument

that Dr. Merayo's opinion was unreliable, the defendant attached to its motion in limine

the Affidavit from Dr. Poliacoff, which provides, in relevant part:

> 1.     I am a psychologist licensed to practice in the State of Florida;
> I have a Certificate of Professional Qualification in Psychology, issued by
> the Association of State and Provincial Psychology Boards, and I am listed
> in the Council for the National Register of Health Service Providers in
> Psychology.

> 2.     My primary areas of practice are psychotherapy with children
> and adults, and forensic evaluations of children and adults in civil matters.

> 3.     I have testified, or otherwise consulted in the preparation of
> evaluations for use by both State and Federal Courts, in over one hundred
> cases.  I have evaluated over two hundred additional cases for other health
> professionals and am frequently called upon by colleagues for supervision
> and consultation in regard to matters of ethical and customary practice in the
> fields of child and forensic psychology.

> 4.     I have been accepted as an expert witness and conducted
> independent forensic evaluations, for both plaintiff and defense counsel, in
> twenty five cases in this circuit since 1998, eleven of which were specifically
> sexual harassment cases. . . .

> 6.     My reasons for detailing the above aspects of my practice in
> this affidavit is to inform the Court as to the basis for my familiarity with
> what is the **usual and customary** practice in forensic psychology and
> psychiatry across the county [sic] and in particular in South Florida.

> 7.     The usual standard of practice for an [sic] forensic psychiatric
> or psychological evaluation for use by the Courts in South Florida (as
> elsewhere) is governed by both ethical guidelines and specific statutory
> requirements.

8.     Such an evaluation should include [a] the administration of appropriate psychological tests, [b] conducting an extended clinical interview, [c] the gathering of data from collateral sources of information (whether by review of relevant documents or interviews with witnesses, or both), [d] a review of relevant empirical research related to the evaluation issues, and [e] the preparation of an expert report, per the local rules governing the admissibility of experts' opinions.

9.     Of particular importance, in the context of litigation, is for the evaluation to address the presence or absence of malingering.

10.     For the Court to avail itself of useful and unbiased opinion in the formation of its decisions, it should be able to rely on expert testimony that is as **objective** as possible.  This dictum is articulated in the <u>American Academy of Psychiatry and the Law Ethical Guidelines for the Practice of Forensic Psychiatry</u>, Section IV:

> The Forensic psychiatrist . . . adheres to the principles of honesty and striving for objectivity.  His clinical evaluation and the application of data obtained to the legal criteria are performed in the spirit of such honesty and striving for objectivity.  His opinion reflects this honesty and striving for objectivity.

11.     The <u>Specialty Guidelines for Forensic Psychologists</u> "specify the nature of desirable professional practice by forensic psychologists" (p.656) and caution that psychologists "take special care to avoid undue influence upon their methods, procedures and products, such as might emanate from the party to a legal proceeding" (p.661) in the conduct of their evaluations".

12.     If objectivity is to be achieved in the conduct of a forensic evaluation for use by the Court then the above standards as referenced in paragraph 8 through eleven above, should be adhered to.  <u>To the extent that these standards are not adhered to the proffered testimony by an expert would be based on an examination that falls below the usual and customary benchmarks for forensic examinations and subsequent testimony would be neither useful or [sic] acceptable for consideration by the Court.</u>

(D.E. 393-1 at 123-24 (endnotes omitted) (emphasis added).)  The parties ultimately settled

before Judge Seitz ruled on the motion in limine.  <u>See</u> <u>id.</u>, D.E. 55, 56.

Here, Plaintiffs have not established that Ms. Solares administered the appropriate psychological tests, gathered data from collateral sources of information, or reviewed relevant empirical research related to the evaluation issues.  Nor does her evaluation address the presence or absence of malingering.

In fact, at her deposition, Ms. Solares testified that because she is not a psychologist or a psychiatrist, she <u>cannot</u> perform "psychological tests, personality tests, aptitude tests, [or] neuropsychological tests[.]"  (D.E. 393-1 at 36:12-21.)  She further testified that Carlos found her when he showed up at her office looking for a doctor who used to work there.  (<u>Id.</u> at 39:16 – 40:5.)  Ms. Solares explained that the other doctor no longer worked there and asked if she could help him.  (<u>Id.</u> at 40:1-5.)  Carlos explained that he was involved in a lawsuit with the management company of his apartment building and "wanted to get an evaluation of his family situation[.]"  (<u>Id.</u> at 40:6-25.)  Ms. Solares further testified that although she asked the Plaintiffs whether they had any medical conditions, she only asked to see Angie's medical records.  (<u>Id.</u> at 44:21 – 45:10.)  She further testified that she asked Carlos "to bring all the documentation that he had and any videos or pictures that he could show me to give me a – an idea of what's going on[,]" (<u>id.</u> at 44:5-8), and when he brought those documents and went over them with her she "assumed he was telling [her] the full story" and "was not hiding anything from [her] regarding other events that might have had an effect on [her] assessment[,]" (<u>id.</u> at 48:1-9).  She testified that her position as a therapist is to accept what the patient is telling her as true.  (<u>See id.</u> at 53:12-15.)  She further testified that when doing a biopsychosocial evaluation, it would be important for her to know the patient's legal history and history of legal issues, (<u>id.</u> at 48: 14-17), but that she did not ask

Carlos about his litigation history, (id. at 66:23-25). She also testified that she did not determine the psychological, emotional, and personal distress Defendants caused Plaintiffs in isolation from the psychological, emotional, and personal distress that was caused by other sources, such as Carlos's other lawsuits during the relevant period, the fact that Carlos was attacked and hospitalized, Carlos's interactions with the police, and the family's stresses of caring for a disabled family member—indeed, she did not know about many of these issues. (See id. at 67:16 – 77:24.) She also appears to testify that she only performed a full biopsychosocial evaluation for Angie, and she does not explain what methodology she used to evaluate the other Plaintiffs' distress. (Id. at 70:2-7.) She further testified that she did not know that the Fair Housing Act had a two-year statute of limitations, but that "in terms of how [she] was conceptualizing the case it doesn't matter." (Id. at 85:21 – 86:10.) She was "conceptualizing the case as it had been presented to [her]" by Carlos. (Id. at 86:19-21.)

Under similar circumstances, Judge Jordan excluded an expert opinion in Amos, a case in which the plaintiffs sued their former employer for race discrimination. 2001 WL 360955915, at *1. The plaintiffs hired Dr. Antoinette Appel, a neuropsychologist with a specialty in traumatic brain injuries, to testify as to their psychological damage. Id. Judge Jordan initially noted that Judge Appel was, at best, "marginally qualified to testify as an expert in this case[,]" and took that into consideration in the Daubert calculus. Id. at *2. He then found that even assuming Dr. Appel was qualified to testify as an expert, "her testimony and opinions are not sufficiently reliable to be presented to the jury." Id.

23

Because of its relevance to this case, the Court reproduces a significant portion of Judge

Jordan's order below:

> [T]he non-exclusive factors helpful in determining whether an expert's testimony will assist the trier of fact are (1) whether the expert's theory or technique can be and has been tested, (2) whether it has been subject to peer review, (3) the known or potential rate of error, and (4) the degree of acceptance in the relevant scientific community. Daubert[,] 509 U.S. at 593–595. Dr. Appel's report and testimony do not satisfy the first factor because her technique has not and cannot be tested. Dr. Appel concedes that she did not rely on any theory or methodology in evaluating the plaintiffs and did not perform any tests on the plaintiffs. See Appel Deposition at 36, 69–70, 193–194. In addition, Dr. Appel did not take any notes of what she asked the plaintiffs or their responses. See id. at 27. She also did not retain any documents reflecting the procedure she used in evaluating the plaintiffs. See id. at 61. Aside from the summary of her clinical interviews and the conclusions in her report, there is nothing regarding her technique that can be reviewed and tested. Compare Elcock, 223 F.3d at 747 (although vocational rehabilitation is a social science "that does not exactly mirror the fundamental precepts of the so-called harder sciences," testimony from the plaintiff's psychologist was not admissible under Daubert where the expert did not explain his methodology in rigorous detail, making it "nearly impossible" for the defendant's experts to repeat the psychologist's "apparently subjective methods"), and Bushore v. Dow Corning–Wright Corp., No. 92–344–CIV–T–26C, 1999WL 1116920, at *3 (M.D. Fla. Nov. 15, 1999) (holding that a physician's testimony, based upon clinical observations, was inadmissible [sic] because the observations they were "not a part of a controlled clinical study accompanied by a scientific protocol" and "such informal case studies cannot be replicated by others desiring to confirm" the physician's conclusions), with Jenson v. Eleventh Taconite Co., 130 F.3d 1287, 1296–1298 (8th Cir. 1997) (reversing the district court's exclusion of testimony by psychologists and psychiatrists on the issue of damages for mental anguish where opinions offered were thorough, meticulously presented, and the "methodology for arriving at their opinions was laid out clearly by each" expert).
>
> Dr. Appel's opinions and testimony also fail to satisfy the first prong of the Daubert test because she offers no reliable basis for her opinions.[7] She relied

---

[7]   I note that Dr. Appel is not a treating psychologist, but rather a psychologist who was retained to evaluate the plaintiffs for the purposes of litigation. While this fact alone does not prove that Dr. Appel's technique is scientifically invalid, it is a relevant consideration, particularly

almost entirely on approximately two and a half hours of clinical interviewing for each of the plaintiffs.  <u>See</u> Appel Deposition at 36, 86.  Dr. Appel did not talk with any family members or other people acquainted with the plaintiffs in reaching her conclusions.  <u>See id.</u> at 87.  Dr. Appel also failed to explore any criminal history or background of the plaintiffs as a possible source of depression, even though she admits that criminal accusations could cause depression.  <u>See id.</u> at 204–205, 210.  <u>Cf.</u> <u>Everett v. Georgia–Pacific Corp.</u>, 949 F. Supp. 856, 858 (S.D. Ga.1996) (holding that expert testimony failed the first prong of the <u>Daubert</u> test and was based on "mere speculation" where the only information considered in forming the opinion was the plaintiffs statement, the expert "failed to engage in any rigorous analysis to determine the cause" of the plaintiff's illness, the expert failed to "conduct a thorough review" of the plaintiff's past medical history, the expert did not eliminate other possible causes of the plaintiff's illness, and the expert admitted that he could not state with any degree of medical certainty whether the plaintiff's illness was caused by exposure to medical fumes). Put another way, Dr. Appel's testimony is not "based upon sufficient facts or data" and is not the "product of reliable principles and methods" to warrant admission. Fed. R. of Evid. 702(1)-(2).

Additionally, Dr. Appel's opinions and testimony do not satisfy the second prong of the <u>Daubert</u> analysis because her techniques and methodology have not been subjected to peer review.  In fact, peer review of her techniques and methodology is not possible because she did not conduct any tests, including the MMPI test that she admits most psychologists use, and did not take any notes of her evaluation.  <u>See</u> Appel Deposition at 27, 36–40.  Furthermore, she has not published any peer review articles, nor presented any articles explaining her technique for evaluating alleged victims of race discrimination.  <u>See</u> Appel C.V.  While publication (or lack thereof) in a peer reviewed journal is not dispositive, it is a relevant "consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised." <u>Daubert</u>, 509 U.S. at 594.  Because Dr. Appel's opinions and testimony cannot be subjected to peer review, they also cannot be measured for likelihood of error, the third <u>Daubert</u> factor.

It is not clear whether Dr. Appel's technique is generally accepted in the relevant scientific community, the fourth <u>Daubert</u> factor.  Dr. Appel has not presented any documents reflecting the procedure she used in evaluating the

---

in light of the other misgivings I have about her testimony. <u>Cf.</u> <u>Hose v. Chicago Northwestern Transp. Co.</u>, 70 F.3d 968, 973 (8th Cir. 1995) ("The fact that Hose's treating physician ordered the PET scan prior to the initiation of litigation is another important indication that this technique is scientifically valid.").

plaintiffs, <u>see</u> Appel Deposition at 61, and the articles that she cites to in her report appear to document racial discrimination in the workplace, rather than address the psychological impact of racial discrimination, <u>see</u> Report of Dr. Appel at n. 1 & 2 (April 29, 2001) [D.E. 156 Exh. B].  In sum, Dr. Appel's opinions and testimony do not weigh in favor of admission under the <u>Daubert</u> test.

<u>Id.</u> at *2-3 (footnote in original).

Similarly, here, Ms. Solares's opinions fail to satisfy the first prong of <u>Daubert</u> because she did not employ a reliable methodology.  Although her First Affidavit states that she performed a "Mental Status Examination[,]" "Biopsychosocial examinations[,]" and considered "economic, social and familiar factors affecting [Carlos] and his family[,]" there is no evidence that these are reliable methods for determining the cause and extent of psychological, emotional, and personal distress in a discrimination and retaliation case. The only evidence in the record as to the proper standards for evaluating a civil litigant for emotional distress is Dr. Poliacoff's Affidavit from the <u>Medina</u> case, (<u>see</u> D.E. 393-1 at 123-24), and as discussed above, Ms. Solares did not employ those standards.  Moreover, at her deposition she testified that she "did the biopsychosocial more on Angie than everybody else" and "mostly on the perspective – on the perspective of Angie."  (<u>Id.</u> at 70:4-9.)  She does not explain what methodology she employed to determine the cause and extent of the other Plaintiffs' psychological, emotional, and personal distress, and Plaintiffs do not explain why the Court should accept that (unknown) methodology as reliable.

Additionally, Ms. Solares's opinions fail to satisfy the first prong of the <u>Daubert</u> test because she offers no reliable basis for her opinions.  She relied almost entirely on interviews with the Plaintiffs, during which she "had the opportunity to view documents,

26

photos and videos showing different situations, involving the apartment building, that affected Carlos, Fe and their children." (<u>See</u> Second Aff. ¶¶ 3-5.) Ms. Solares did not talk with any other people acquainted with Plaintiffs in reaching her conclusions; failed to explore Carlos, Fe, Katy, and Jany's medical histories (other than orally asking them whether they have any "medical conditions"), (D.E. 393-1 at 45:2-10); and failed to explore issues that Ms. Solares admitted were relevant to psychological, emotional, and personal distress, such as legal issues and litigation history, (<u>id.</u> at 66:23-25). This latter failure is particularly important in this case because during the relevant period, Carlos was (and is) involved in multiple other lawsuits—including two filed in the Southern District of Florida. In <u>Alonso v. Jackson Memorial Hospital, et al.</u>, Case No. 18-24045-Civ-Gayles (S.D. Fla. filed Oct. 2, 2018) ("<u>Jackson Memorial</u>"), Carlos is suing Jackson Memorial Hospital for discrimination, retaliation, personal injury, and other damages, including "Emotional Distress[,]" "Anxiety and Anguish." <u>Jackson Memorial</u>, D.E. 1 at 15. The basis of this lawsuit is that the hospital did not provide Angie "attention as quickly as needed, after Plaintiff requested it as a reasonable accommodation" when Carlos took Angie to the emergency room in September 2016. <u>Id.</u> at 3. Ms. Solares testified that she "remember[ed] hearing about" the <u>Jackson Memorial</u> case, but testified that Carlos did not show her a copy of the lawsuit, and that she did not have much knowledge about that case. (<u>Id.</u> at 66:16 – 67:8.) In <u>Alonso v. Dr. Gladys Y. Alonso</u>, Case No. 18-23668-Civ-Scola (S.D. Fla. filed Sept. 7, 2018) ("<u>Dr. Gladys Alonso</u>"), Carlos is suing Dr. Gladys Alonso for discrimination, retaliation, personal injury, and other damages, including "Emotional Distress," "Anxiety and Anguish[.]" <u>Dr. Gladys Alonso</u>, D.E. 1 at 7. The basis of this

27

lawsuit is that Angie's doctor does not visit him at his home every month as requested by Carlos, and does not sign "the medical papers, needed every (60) days, to support the medical necessity of the 'Plaintiff's' disabled son, in order to receive services." Id. at 3, 5. Ms. Solares was not aware of this lawsuit. (D.E. 393-1 at 71:21-23.)  Both of the cases are still pending.  Additionally, Ms. Solares testified that Carlos never told her that he had been attacked and beaten.  (Id. at 73:7-9.)  This apparently led to another pending lawsuit in which Carlos is claiming he suffered permanent and continuing bodily injury.  (See id. at 73:13-20.)  Finally, Ms. Solares simply accepted everything Carlos and the other Plaintiffs told her as true, and did not evaluate them for malingering.  (Id. at 48:1-9; 53:12-15.)  For these reasons, Ms. Solares's opinion fails Daubert's first prong.   Amos, 2001 WL 36095915 at *3; Everett, 949 F. Supp. at 858 (holding that expert testimony failed the first prong of the Daubert test and was based on "mere speculation" where the only information considered in forming the opinion was the plaintiffs statement, the expert "failed to engage in any rigorous analysis to determine the cause" of the plaintiff's illness, the expert failed to "conduct a thorough review" of the plaintiff's past medical history, the expert did not eliminate other possible causes of the plaintiff's illness, and the expert admitted that he could not state with any degree of medical certainty whether the plaintiff's illness was caused by exposure to medical fumes).

Next, Ms. Solares's opinions and testimony do not satisfy the second prong of the Daubert analysis because her techniques and methodology have not been subjected to peer review.  As in Amos, Ms. Solares's techniques and methodology cannot be peer reviewed because she did not conduct any psychological tests.  In fact, she testified that she cannot

perform psychological tests because she is not a psychologist or psychiatrist.  (Id. at 36:12-21.)  Furthermore, Ms. Solares has not published any peer review articles, nor presented any articles explaining her technique for evaluating alleged victims of housing discrimination.  "While publication (or lack thereof) in a peer reviewed journal is not dispositive, it is a relevant 'consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised.'"  Amos, 2001 WL 36095915, at *3 (quoting Daubert, 509 U.S. at 594).

Finally, Ms. Solares does not assert, and Plaintiffs have established, that her techniques are generally accepted in the scientific community as a basis for determining psychological, emotional, or personal distress in cases of discrimination and retaliation.

For all of these reasons, the Court finds that Ms. Solares's opinion is unreliable.  See id. at *3-4.

The case to which Plaintiffs cite in support of their position is unavailing.  In Mancuso, property owners sued the company that owned a neighboring electrical substation ("ConEd") alleging that PCBs used at the substation contaminated their land and caused their illnesses.  967 F Supp. at 1440-41.  Relevant here, the plaintiffs hired Dr. Jeanne Dietrich, a clinical psychologist, to testify that one of the plaintiffs ("Theresa") suffered from a learning disability.  Id. at 1453.  The defendant filed a motion in limine challenging Dr. Dietrich's methods and conclusions.  Id.  The Court observed that:

> Dr. Dietrich examined Theresa three times in May and June of 1995.  During the course of her examinations, she administered several standard intelligence and performance tests to Theresa, including the Wechsler Pre–School and Primary Scale of Intelligence, Revised ("WPPSI–R"), and the Kaufman Assessment Battery for children.  She determined that while

Theresa's overall intelligence was in the average range, she had "significant attention and memory weaknesses" and "unevenness in cognitive abilities" that would present "stumbling blocks to learning in a traditional manner." (Dietrich Report of 6/28/95, Exh. VV.)  While Dr. Dietrich did not provide percentiles for Theresa's Weschler scores, Theresa scored below 50th percentile in 10 of the 15 subtests in the Kaufman Assessment.  (Id., p. 3). Theresa also scored 50% or below in seven of the eleven WPPSI–R subtests that ConEd's own expert, Dr. Gordon, administered to her.  (Exh. UU at 8.) Dr. Dietrich concluded that Theresa is suffering from "attention deficit disorder and learning disability (mixed type affecting both language and the perceptual domain)".  (Id. at 9.)

Id. at 1453-54.  The defendants argued that Dr. Dietrich's opinion was unreliable because, inter alia, she did not employ the DSM-IV method for determining a specific learning disorder.  Id. at 1454.  Dr. Dietrich testified that she did "need to follow the DSM methodology because although the DSM is widely respected in the field of psychological disorders, it is not the 'bible' for determining learning disability."  Id. at 1454-55.  The court noted that ConEd's "arguments against Dr. Dietrich's conclusion that Theresa is learning disabled are quite powerful," but concluded that Dr. Dietrich's testimony should not be excluded:

We are not convinced that Dr. Dietrich must follow the DSM–IV methodology for diagnosing a specific Learning Disorder in order to testify. ConEd has cited no cases in which a qualified psychologist was excluded from testifying because she did not follow the DSM–IV.  Nor do we believe we can conclude that Dr. Dietrich's diagnosis does not fit under the category of "Learning Disorder Not Otherwise Specified."  Dr. Dietrich is a well qualified psychologist who gave Theresa established intelligence and performance tests.  ConEd can impugn Dr. Dietrich's testimony at trial by presenting to the jury Theresa's report cards and the evidence that Theresa does not have a learning disability under either the DSM–IV criteria or the federal and state guidelines as applied by the New Rochelle School District's CSE.  Indeed, this latter argument packs considerable force, because it appears that these are the same guidelines that Dr. Dietrich relies upon to support her opinion.  Although Dr. Dietrich's opinion appears to rest, in the end, on essentially her "clinical psychoeducational" judgment, we believe

30

that in an area of science as grey as learning disabilities, ConEd's counter-evidence properly goes to the weight, not to the admissibility of Dr. Dietrich's testimony.

Id. at 1456.

Here, on the other hand, Ms. Solares is not a well-qualified psychologist who administered established tests for determining whether and to what extent Defendants caused Plaintiffs psychological, emotional, and personal distress.  As previously stated, Ms. Solares conceded that she cannot administer "psychological tests, personality tests, aptitude tests, [or] neuropsychological tests" because she is not a psychologist or psychiatrist. (D.E. 393-1 at 36:12-21.)  Moreover, the only evidence in the record as to the proper standards for evaluating a civil litigant for emotional distress is Dr. Poliacoff's Affidavit from the Medina case, (see D.E. 393-1 at 123-24), and as discussed above, Ms. Solares did not employ those standards.  Nor did Ms. Solares explain why her methodology was reliable.  As such, Mancuso is inapposite.

In sum, Plaintiffs have failed to carry their burden of establishing by a preponderance of the evidence that (1) Ms. Solares is qualified to testify regarding the cause and extent of Plaintiffs' psychological, emotional, and personal distress, and (2) her opinion is reliable.

IV.     **Conclusion**

Accordingly, it is **ORDERED AND ADJUDGED** that Defendants' Daubert

Motion Seeking to Strike the Designation of Nani Solares, M.S., as an Expert Witness and

Preclude the Use and/or Presentation of Her Opinions and Expert Witness Report at Trial

or for Other Purposes (D.E. 393) is **GRANTED**.

**DONE AND ORDERED** in Chambers at Miami, Florida this 19th day of February,

2021.

*Joan A. Lenard*

**JOAN A. LENARD**
**UNITED STATES DISTRICT JUDGE**